UNITED STATES SUPERIOR COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JAMES M. CRONAN and KAREN R. MERRITT, Plaintiffs, <br> v. <br><br> JOSEPH M. DIORIO <br> Defendant. | CIVIL ACTION NO. - |

**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF, AND REQUEST FOR EMERGENCY HEARING AND ADA ACCOMMODATIONS**

PRELIMINARY STATEMENT

This action is brought solely against Joseph M. DiOrio, former Chapter 11 and Chapter 7 trustee of Classic Display, Inc., in his personal capacity. Barton v. Barbour, 104 U.S. 126 (1881), recognizes prudential limits on suits against trustees, but immunity is not absolute. A trustee who acts outside lawful authority—ultra vires—is personally liable.

Plaintiffs plead two clear pillars of ultra vires/personal-capacity misconduct:

(a) 2010 (Count I, surgical pre-appointment): Before posting bond or filing an acceptance/verified statement, Defendant acted without any color of office: he froze the debtor-in-possession account and effectively shut down operations based on a mischaracterized bench remark from July 8, 2010 that was never reduced to a written shutdown order and was addressed to the debtor—not to a trustee. Those pre-qualification acts are ultra vires per se and foreseeably precipitated cascading harm.

1

(b) 2024–2025 (Count II): After selling the $260,000 default judgment in 2024 and being fully divested, Defendant continued to act as if he retained trustee authority in state court, appeared/allowed filings in his trustee title, and permitted executions to issue in his trustee name—then leveraged those trustee-titled executions in settlement. Post-divestiture misuse lacks any color of office and is actionable abuse of process.

During this same period, **Ralph Grieco** and **James Tiernan**—Cronan's business counterparts in Classic Group—positioned themselves to control the Mill. In **2012**, title to **80 Fountain Street** (the "Mill") moved first into Grieco and Tiernan and then into **80 Fountain Street LLC**, an entity they own/control. In **2024**, that same entity—**80 Fountain Street LLC**—purchased the DiOrio default judgment and in **early 2025** sought to register and enforce it. The fact that the Mill's titleholder acquired and wielded the judgment ties the **2010** pre-appointment shutdown to the **2012** transfer and the **2025** enforcement, supporting improper purpose (Count II) and the discovery-rule timeline. Plaintiffs **reserve all rights** against Grieco, Tiernan, and 80 Fountain Street LLC; those issues are being litigated elsewhere and are not part of this action.

Trustee immunity is conditional, not absolute. It depends on authority and disclosure. See Mosser v. Darrow, 341 U.S. 267, 272 (1951); LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 196 F.3d 1, 7 (1st Cir. 1999). Here, Defendant acted (i) before he had any authority at all, and (ii) after he was fully divested.

Jurisdiction and venue are proper under 28 U.S.C. §§ 1331, 1334(b), and 1391(b). Plaintiffs sue Mr. DiOrio personally; they do not seek relief against the Cronan Realty LLC estate or its trustee, and do not seek to disturb state-court orders.

PARTIES

Plaintiff Karen R. Merritt is an individual residing in Norton, Massachusetts. She was not a debtor, creditor, or party in interest in the Classic Display bankruptcy.

Plaintiff James M. Cronan is an individual residing in Norton, Massachusetts. He was the principal of Classic Display, Inc.

Defendant Joseph M. DiOrio is an attorney in Providence, Rhode Island. He served as Classic Display's Chapter 11/7 trustee. Plaintiffs sue him in his individual capacity for acts outside the scope of lawful authority.

JURISDICTION, VENUE, AND BARTON FRAMEWORK

This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1334(b). Venue is proper under 28 U.S.C. § 1391(b). **Plaintiffs do not consent** to entry of final orders or judgment by a bankruptcy judge and seek Article III adjudication and a jury trial in this Court.

**Barton framework.** Plaintiffs acknowledge Barton's prudential rule but plead (i) **pre-appointment acts** with no color of office and (ii) **post-divestiture acts**—categories for which leave is not required. See *Tufts v. Hay*, 977 F.3d 1204, 1209 (11th Cir. 2020) (post-closure/divestiture suits not barred); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 7 (1st Cir. 1999) (disclosure predicate); cf. *Leonard v. Vrooman*, 383 F.2d 556, 560 (9th Cir. 1967) (pre-appointment acts not protected).

**Prior bankruptcy-court characterization.** In June and July 2025, the Bankruptcy Court denied Plaintiffs' request for leave to sue Mr. DiOrio, finding that the alleged conduct involved

3

"**non-estate property** and transactions that occurred **outside the scope of the bankruptcy estate** that impact only Cronan individually." (Ex. **G-1** at 5 (June 30, 2025 Memorandum); see also Ex. **G** (July 29, 2025 Order)). The court also recited that the Debtor **did not own real estate** and that the Mill (80–84 Fountain Street) was owned by **Cronan Realty LLC**, with secured claims tied to **non-estate** real property (Ex. **G-1** at **2**). These findings confirm the absence of estate-administration jurisdiction and reinforce that Barton does not apply.

**Targeted safety valve.** Plaintiffs sue Mr. DiOrio in his personal capacity for ultra vires conduct (pre-qualification shutdown; post-divestiture misuse). They do not seek relief against any bankruptcy estate or its trustee and do not ask this Court to disturb state-court orders. If the Court concludes that Barton applies to any discrete **remedy**, Plaintiffs respectfully request that the Court: (1) \*\*stay—not dismiss—\*\*that remedy while Plaintiffs file a targeted leave motion in the Bankruptcy Court; or (2) transfer that discrete leave request under 28 U.S.C. § 1631 solely to seek leave, preserving the original filing date; and (3) recognize that limitations are tolled during the leave process.

**Reservation & consistency.** Plaintiffs allege that Defendant's **pre-appointment shutdown** in July 2010 and **post-divestiture misuse** in 2025 were substantial contributing factors to later harms. Plaintiffs expressly do not allege that Mr. DiOrio was the sole proximate cause of all downstream injury. Misconduct by other actors (including insiders) is the subject of separate proceedings and is not waived here.

**Rule 19 Statement (Nonjoinder of Insiders).** This action seeks **personal-capacity** relief against Mr. DiOrio only—namely: (i) damages and declaratory relief concerning his **pre-appointment** acts in July 2010 (Count I); (ii) as necessary to the claims and defenses here,

declarations confined to the **lawfulness of Mr. DiOrio's own** interim trustee-titled enforcement steps during **2012–2017** (e.g., domestication and post-judgment discovery) to the extent they bear on appearance-of-regularity and tolling; and (iii) damages, declarations, and a **narrow injunction** concerning his **post-divestiture** use of the trustee title in **2024–2025** (Count II). Complete relief on those claims **does not require** the presence of non-parties such as Ralph Grieco, James Tiernan, or 80 Fountain Street LLC. Adjudication of Mr. DiOrio's liability will not impair or impede any claimed interests of those non-parties because this Complaint (1) seeks **no adjudication of title** to the Mill, (2) seeks **no relief against** the non-parties themselves, and (3) limits declaratory relief to the **lawfulness of Mr. DiOrio's own acts** (e.g., whether the July 9–12, 2010 shutdown/freeze was ultra vires; whether trustee-titled executions issued in March 2025 were ultra vires). See Fed. R. Civ. P. 19(a). To the extent the Court were to conclude that any non-party is necessary for a discrete remedy, Plaintiffs request that such remedy be **stayed or severed** rather than the action dismissed.

**Related Proceedings (Disclosure; No Preclusion).** In **PC-2019-3655** (R.I. Super. Ct.), Plaintiffs litigated partnership/insider disputes involving Classic Group and certain related entities. That case does **not** seek quiet title to 80 Fountain and did **not** adjudicate title or the validity of land-evidence instruments. Any dismissal there is the subject of a pending **Rule 60(b)(4)** motion to vacate for voidness based on unauthorized practice, and thus is **not final on the merits** for preclusion purposes (see Ex. **O**). Separate Massachusetts proceedings address property-specific issues. Plaintiffs disclose these matters to demonstrate diligence, avoid duplication, and clarify that this federal action targets **Mr. DiOrio's conduct only**. Plaintiffs do not seek duplicative recovery and will accept appropriate offsets to prevent double counting.

**No adjudication of Massachusetts title/foreclosure issues.** This complaint does **not** seek a determination of Massachusetts title or the validity of any foreclosure-related notices; those issues are before the Massachusetts Superior Court.

**Pleading in the alternative; no collateral admissions.** Allegations are pleaded in the alternative and, where appropriate, on information and belief. They are not admissions for use in any other case and shall not be construed to concede any fact or issue pending elsewhere. Plaintiffs reserve all rights and remedies across matters, with no double recovery; any monetary award will be subject to appropriate offsets to prevent duplication.

EMERGENCY RELIEF AND ADA ACCOMMODATIONS

Plaintiffs seek narrow emergency relief to prevent further misuse of the trustee title post-sale and to correct records. Plaintiff Merritt is a senior with serious health limitations; Plaintiff Cronan is also a senior. Plaintiffs request reasonable accommodations (expedited scheduling where ongoing property interests are at risk; extensions as needed; authorization for remote participation).

COUNT I — PRE-APPOINTMENT ULTRA VIRES SHUTDOWN (JULY 2010)

Defendant's own First Status Report admits he was not appointed or qualified until July 13, 2010, yet on July 9 he (i) froze the debtor-in-possession (DIP) account, (ii) opened a "trustee account" showing a $3,038.61 balance, and (iii) deposited $18,364.55 in checks received "since the shutdown," invoking a supposed "shutdown" from a July 8 hearing (First Status Report, Ex. B ¶¶ 4,12). There was no written shutdown order, and whatever bench remarks were made on July 8 were directed to the debtor, not to a trustee who did not yet exist in law (bond/acceptance entered July 13; Exs. A, A-1, A-2). These July 9–12 takings and controls were undertaken

6

x

without color of office and are ultra vires per se. The Report further places the **rent/SBA pipeline** squarely at issue, stating there is an "issue as to the proper disposition of rental income" from approximately fifteen subtenants and that, pending resolution, subtenants had been told to pay **Cronan Realty** toward the **mortgage/SBA obligations** (Ex. B ¶¶ 20–21). That pairing—an immediate shutdown/freeze with an unresolved rent stream that serviced SBA-secured obligations—predictably starved operations and impaired SBA servicing. Defendant's mischaracterization of a bench remark as a binding shutdown order—and his reliance on that fiction to act as "trustee" pre-appointment—supplies the who/what/when/where/how particulars under Rule 9(b) (First Status Report, Ex. B ¶¶ 4, 12, 20–21; Exs. A, A-1, A-2).

### B. Mischaracterization of authority (shutdown premise).

Defendant's reporting presented the July 8 bench remarks as an operative shutdown "order" to justify immediate control over operations, when no such written shutdown order existed and no authority had yet vested in a trustee. This mischaracterization concealed the absence of lawful authority and induced reliance on the appearance of regularity. The same premise was later accepted and repeated by the Bankruptcy Court, deepening Plaintiffs' reliance and confusion.

### C. Causation, foreseeability, and harm.

A premature shutdown and seizure of operational control foreseeably starve a business of cash flow, damage customer/supplier relationships, and precipitate defaults. Defendant's ultra vires acts were a substantial factor in causing the loss of going-concern value and downstream harms. Independent misconduct by insiders later exploited the crisis; both can be concurrent proximate causes.

**Rule 9(b) particulars (supplement).**

As to misstatements/omissions: **who**—Defendant, the panel trustee; **what**—presentation of July 8 bench remarks as a shutdown "order" and acting before qualification; **when**—July 2010 status reporting; **where**—the bankruptcy docket; **how**—by invoking a non-existent written shutdown order and proceeding before bond/acceptance.

**D. Rent stream & SBA servicing (foreseeability; no resolution).**

The First Status Report puts the subtenant rent stream and SBA-tied pipeline front-and-center, expressly stating there was an "issue as to the proper disposition of rental income" from approximately fifteen subtenants and that, pending resolution, subtenants had been told to pay Cronan Realty (First Status Report ¶¶20–21). No trustee motion was filed to submit that "issue" for decision, and no written order ever resolved it. Instead, Defendant had already frozen the DIP account and invoked a non-existent shutdown before any color of office. In this posture, the combination of (i) an immediate shutdown/freeze and (ii) an unresolved rent pipeline that serviced SBA-related obligations predictably starved operations and impaired SBA servicing, precipitating downstream defaults and loss of going-concern value.

**E. Non-estate rents; duty to seek instruction; no immunity.**

The Mill was owned by **Cronan Realty LLC**, a separate, non-debtor landlord; the Debtor's schedules reflect **no real estate**, and the secured claims (Bristol County Savings Bank, Pawtucket Business Development Corp., and the SBA) were **secured by non-estate real property** located at 80–84 Fountain Street. **Cronan Realty**, not the Debtor, listed the Mill on its Schedule A in its own chapter 11 (Bk. No. 10-10836). *(See Ex. G-1 at 2 (June 30, 2025 memorandum, "Relevant Facts and Procedural History").)* On these facts, the subtenant rents

were **not** property of the Classic Display estate. A trustee has **no authority** to direct or interfere with **non-estate** property, and when uncertainty exists, must make **full and frank disclosure** and **seek instruction** before acting. See **Mosser v. Darrow**, 341 U.S. 267, 272–73 (1951); **LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)**, 196 F.3d 1, 7 (1st Cir. 1999); cf. **Leonard v. Vrooman**, 383 F.2d 556, 560 (9th Cir. 1967). Here, Defendant **flagged** a rent-disposition "issue," obtained **no order**, and nonetheless proceeded with a **pre-appointment** shutdown/freeze, defeating any claim to quasi-judicial immunity. In the alternative, to the extent any slice of that stream overlapped the Debtor's receivables, **11 U.S.C. § 363(c)(2)** barred **use** of such cash absent secured-creditor consent or a **cash-collateral order**—neither of which was sought **before July 13, 2010**. The **Bankruptcy Court** confirmed this non-estate posture: "The Supplemental Filings… relate to **non-estate property** and transactions that occurred **outside the scope of the bankruptcy estate** that impact only Cronan, individually." *(Ex. G-1 at 5)*.

**F. Causal chain and conversion.**

Within a short interval of the pre-appointment shutdown/freeze, Defendant represented that the business was not viable and the case proceeded toward liquidation. The cash starvation created by the shutdown and the unresolved rent/SBA pipeline supplied the predicate for that shift. Those same conditions enabled insiders, in 2012, to capture the Mill—a foreseeable consequence of acting without authority and without seeking court instruction.

COUNT II — ABUSE OF PROCESS / POST-DIVESTITURE ULTRA VIRES (2024–2025)

**Divestiture.** On **November 20, 2024**, the Bankruptcy Court approved the sale of the $260,000 default judgment to **80 Fountain Street LLC** (owned/controlled by insiders). From that date forward, Defendant was fully divested of authority to act as "trustee" with respect to that judgment (see **Ex. M**).

**Post-divestiture filings and executions.** Although the Bankruptcy Court approved the sale/assignment of the judgment on **November 20, 2024**, Mr. DiOrio **continued to use the trustee title** in state court. On **March 19, 2025**, he filed a **Statement of Non-Objection** in Bristol Superior Court identifying himself as "**Chapter 7 Trustee**" (Ex. H). On **March 25, 2025**, his counsel appeared for the "Plaintiff" under that caption (Ex. H). On **March 26, 2025**, the court allowed substitution of **80 Fountain Street LLC** and **issued executions** under a **trustee-titled caption (Ex. I-1, I-2)**. Mr. DiOrio did not move to **withdraw** the trustee appearance until **April 24, 2025**, leaving the trustee-titled filings and executions to circulate publicly for nearly a month (Ex. J).

**Misuse and coercion.** On **April 18, 2025**, opposing counsel transmitted a settlement demand that leveraged the trustee-titled executions to pressure Plaintiffs to abandon or compromise separate claims against insiders (**80 Fountain/Grieco/Tiernan**) (Ex. L).

**Elements (RI & MA).** Abuse of process requires **(1)** use of "process," **(2)** for an ulterior/illegitimate purpose, and **(3)** resulting damage. See, e.g., *Hillside Assocs. v. Stravato*, 642 A.2d 664, 667 (R.I. 1994); *Quaranto v. Silverman*, 345 Mass. 423, 426 (1963); *Gutierrez v. MBTA*, 437 Mass. 396, 407 (2002). "Process" includes **executions and writs**; using them to coerce concessions unrelated to adjudicating the underlying claim is actionable.

**Particulars. Process used:** trustee-titled filings/appearance on **3/19/2025** and **3/25/2025**, and **executions issued 3/26/2025** (Exs. H, I). **Improper use:** after the **11/20/2024** sale/assignment, Defendant had **no authority** to act as "trustee"; issuing/using **trustee-branded** executions **post-divestiture** is not proper in the regular course. **Ulterior purpose:** the **4/18/2025** settlement demand expressly leveraged those executions to coerce **collateral concessions** unrelated to

adjudicating the judgment (Ex. L). **Damage:** the misbranded filings/executions tilted the field, threatened property interests, and distorted negotiations.

**Purchaser/insider context.** The judgment purchaser/enforcer was **80 Fountain Street LLC**[1], the Mill's titleholder, underscoring that the executions and filings were used to coerce **property-related** concessions rather than to pursue neutral collection (see registration/enforcement packet, Ex. M).

**Ultra vires (pled in the alternative).** Post-divestiture conduct lacked any **color of office**. Immunity does not attach to acts outside authority or without court order. See *Mosser v. Darrow*, 341 U.S. 267, 272–73 (1951); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 7 (1st Cir. 1999). **Barton** does not bar claims once the estate is closed/divested. See *Tufts v. Hay*, 977 F.3d 1204, 1209 (11th Cir. 2020). **Timeliness:** Count II accrued in **March–April 2025** and is **timely on its face**.

**Anti-SLAPP clarification.** Count II is **not** based solely on "petitioning activity." It challenges **non-privileged, post-divestiture misuse of the trustee title**, including the **procurement and public circulation of void executions** and the **failure to promptly correct the record**. In the alternative, even if any portion were deemed petitioning, it was **devoid of any reasonable factual support or arguable basis in law** because the **sale/assignment order of November 20, 2024 (Ex. M-1) divested** Defendant of authority to act as "trustee" with respect to the judgment.

---

[1] The trustee's **Form 2** identifies **Godbout Law PLLC** as the purchaser/assignee of the 2012 default judgment (**Ex. N-10**). The **Bristol Superior Court registration** identifies **80 Fountain Street LLC** as the judgment creditor/plaintiff (**Ex. M**). Plaintiffs understand that Godbout Law PLLC purchased or held the judgment for 80 Fountain Street LLC, or later assigned it to 80 Fountain Street LLC. This footnote is offered solely to clarify the chain of assignment; the claims here are directed to **Mr. DiOrio's post-divestiture conduct**, not to counsel.

11

BACKGROUND NARRATIVE (INSIDERS, RELIANCE, AND DISCOVERY)

From 2010 forward, Plaintiffs reasonably relied on the apparent regularity of the trustee's filings and on financial advisor/insider Ralph Grieco, who presented himself as a rescuer after the shutdown. Grieco's influence continued through 2017, and Plaintiffs' subsequent state-court litigation centers on his insider role. In 2024, Grieco-affiliated interests acquired the default judgment; in early 2025, trustee-titled executions were issued and used to pressure settlement. The combination of (i) a mischaracterized shutdown premise in 2010 and (ii) post-divestiture misuse in 2025 revealed the through-line and crystallized Plaintiffs' claims against Defendant personally.

## TIMELINESS & TOLLING

### Overview; Count II (timely on its face).

Count II is facially timely, accruing no earlier than March–April 2025, when trustee-titled executions issued and were leveraged in a coercive settlement demand (Ex. I; Ex. L).

### Count I — Discovery Rule / Fraudulent Concealment.

**Public-record reliance & initial misdirection.** Plaintiffs reasonably relied on the bankruptcy docket, including the First Status Report, which presented a July 8, 2010 bench remark as an operative "shutdown order" when no written shutdown order existed and no trustee authority had yet vested (First Status Report, Ex. B ¶¶ 4, 12; Exs. A, A-1, A-2).

**Bankruptcy-court adoption.** The Bankruptcy Court later adopted that same premise when denying Barton leave, stating the dispute involved "non-estate property and transactions… outside the scope of the bankruptcy estate that impact only Cronan, individually" (Ex. G-1 at 5).

12

**Serial status reports (2012–2015) — appearance of regularity.** From 2012–2015, the Trustee filed periodic status reports that incorporated the early narrative and described routine post-judgment collection—without disclosing any pre-appointment authority gap or shutdown mischaracterization (see Exs. N-4 (Third Status Report, 12/17/2012), N-5 (Fourth, 3/29/2013), N-6 (Fifth, 4/29/2013), N-7 (Eleventh, 11/2014), N-8 (Fourteenth, 7/13/2015)).

**2015–2016 domestication & deposition (ordinary collection posture).** In Massachusetts Superior Court No. 1573CV00296, the trustee registered the 2012 defaults in 2015, obtained executions that October, and deposed Mr. Cronan in 2016. These steps appeared to be ordinary collection activity and did not disclose the pre-appointment authority gap (see Ex. N-10).

**2017 public status report.** The Twentieth Status Report (Jan. 20, 2017) stated the default judgments would remain of record and discussed collection posture—again, with no disclosure of any pre-appointment authority gap or written shutdown order (Ex. N-1).

**2019–2020 counsel communications (echoing that posture).** In 2019–2020, counsel arranged a meeting at Mr. DiOrio's office and conveyed that he "has a lien" and would likely settle for approximately $40,000—communications Plaintiffs understood as consistent with ordinary trustee authority (Exs. N-2, N-3). (Privilege is waived solely as to these emails for state-of-mind/chronology; not to prove liability or amount.)

**Fraudulent Concealment (Tolling).**

Under R.I. Gen. Laws § 9-1-20 (and, in the alternative, Mass. G.L. c. 260, § 12), if a person fraudulently conceals the existence of a cause of action, the statute of limitations does not begin to run until the cause of action is discovered (or should have been discovered with reasonable diligence). Plaintiffs plead fraudulent concealment with Rule 9(b) particularity as follows:

13

**Who/What/When/Where.** Defendant DiOrio (i) mischaracterized a July 8, 2010 bench remark as an operative shutdown "order," and (ii) proceeded pre-appointment (before bond/acceptance on July 13, 2010) as if he had authority—facts omitted or framed in his First Status Report (filed July 23, 2010) and carried forward through serial status reports and post-judgment filings (2012–2017), and later by trustee-titled enforcement activity and communications (2019–2020, 2024–2025). Those filings and appearances concealed the absence of lawful authority, presented an appearance of regularity, and obscured that the July 9–12 actions were ultra vires.

**How the concealment operated.** The public docket presented the shutdown as court-directed and Defendant as acting within authority; the Bankruptcy Court later adopted that premise in 2025, reinforcing Plaintiffs' belief that his conduct was court-authorized and not personally actionable. Defendant's public filings never disclosed that he had no written shutdown order and no color of office before July 13, 2010. This ongoing presentation deterred discovery of the actionable nature of the July 2010 conduct.

**Reliance and diligence.** Plaintiffs reasonably relied on the official record and focused their efforts on insider litigation. They exercised diligence commensurate with pro se status and the filings' appearance of regularity. Only in 2025, when trustee-titled executions issued and were used to leverage settlement, did Plaintiffs connect their injuries to Defendant's pre-appointment mischaracterization and acts. Plaintiffs then acted promptly (collecting docket materials, giving notice, seeking targeted relief, and filing this action).

**Effect.** Defendant's fraudulent concealment tolled limitations on Count I until discovery in 2025; accordingly Count I is timely. (This fraudulent-concealment tolling is pleaded in addition to the discovery rule, equitable estoppel, and equitable tolling already alleged.) These allegations

do not concede that Defendant acted within the scope of any office; to the contrary, Plaintiffs allege pre-appointment acts with no color of office and post-divestiture misuse.

**Triggering event (2025).**

The causal link to Defendant crystallized only when enforcement began in 2025: the state-court registration and enforcement action filed January 6 (Ex. M); executions issued March 26 under a trustee-titled caption (Ex. I); and the April 18 settlement demand expressly leveraging those executions to coerce collateral concessions (Ex. L). Only then could Plaintiffs connect their injuries to Defendant's pre-appointment shutdown and post-divestiture misuse.

**Diligence.**

Once the discrepancies emerged, Plaintiffs acted promptly: they collected the docket materials, served a Rule 9011 safe-harbor notice on July 31, 2025 requesting correction, sought targeted relief in the bankruptcy court (Barton leave, later denied), and filed this action without undue delay.

**Equitable Estoppel (Tolling).**

Independently and in the alternative, Defendant is estopped from asserting limitations. Through official filings and appearances—presenting a July 8 bench remark as a binding shutdown "order," acting pre-appointment as if authorized, and later maintaining a trustee-titled enforcement posture—Defendant affirmatively induced Plaintiffs to believe his actions were court-directed and not personally actionable. Plaintiffs reasonably relied on that posture and thus delayed suing Defendant personally. Equity bars Defendant from profiting from a delay he caused.

15

**Equitable Tolling (Barton Gate).**

Any applicable limitations period is equitably tolled for the time reasonably consumed by the prudential Barton leave process, through the Bankruptcy Court's orders of June 30 and July 29, 2025 (Ex. G-1). Plaintiffs acted diligently and filed promptly thereafter.

**Legal effect.**

Under the discovery rule and fraudulent-concealment/equitable-tolling doctrines, Count I did not accrue until 2025, when Plaintiffs first had notice of both injury and cause—specifically, the 2025 enforcement through trustee-titled executions revealing the mischaracterized shutdown premise and absence of pre-appointment authority. Count II accrued independently in March–April 2025 and is timely on its face. Accordingly, both counts are timely.

### EXHIBIT INDEX

- **Ex. A** — Order (July 13, 2010) — bond; verified statement; status-report directive; **no shutdown language** (fixes qualification date).
    - **Ex. A-1** — Verified Statement of Trustee (filed July 13, 2010) — qualification date.
    - **Ex. A-2** — Acceptance of Appointment (filed July 13, 2010) — qualification date.
- **Ex. B** — First Status Report (filed July 23, 2010) — admits **pre-appointment** acts on **July 9** (DIP freeze; "trustee account" $3,038.61; $18,364.55 "since the shutdown") and identifies **rent/SBA** issue (¶¶ 4, 12, 20–21).
- **Ex. G** — Bankruptcy Court **Order Denying Leave** (July 29, 2025) — adopts July 8 bench premise.

16

- o **Ex. G-1** — Bankruptcy Court **Memorandum/Order** (June 30, 2025) — **p. 2**: Debtor owned **no real estate**; Mill owned by **Cronan Realty LLC**; secured claims tied to **non-estate** real property. **p. 5**: filings concern **non-estate property / outside estate scope**.
- **Ex. M** — 80 Fountain Street LLC **Complaint to Register/Enforce Judgment** (Bristol County Superior Court, filed Jan. 6, 2025) — identifies purchaser/enforcer as the Mill's titleholder (80 Fountain Street LLC).
  - o **Ex. M-1** — Bankruptcy Court **Order Approving Sale/Assignment of Judgment** to 80 Fountain Street LLC (Nov. 20, 2024) — divestiture date and purchaser identity.
  - o **Ex. M-2** — **Assignment of Judgment / Bill of Sale** (Trustee → 80 Fountain Street LLC).
  - o **Ex. M-3** —**2012 default judgment(s)**
- **Ex. H** — **Bristol Superior Court docket excerpt** (showing: 3/19 "Statement of Non-Objection" by "Chapter 7 Trustee" and 3/25 appearance by Attorney Cuddy).
  - **H-1** — Statement of Non-Objection

Ex. I — **Executions**

Ex. J — **Withdrawal** (filed 4/24/2025).

Ex. L — **Settlement demand** (4/18/2025).

**EXHIBIT INDEX — TIMELINESS & TOLLING (SUPPLEMENTAL)**

- **Ex. N-1 — Twentieth Status Report** (Jan. 20, 2017) — judgments remain of record; collection posture (appearance of regularity).
- **Ex. N-2 — Apr. 12, 2019** counsel email scheduling meeting at Mr. DiOrio's office — state-of-mind/chronology; limited privilege waiver.
- **Ex. N-3 — Mar. 10 & Mar. 19, 2020** counsel emails noting trustee "has a lien" and **~$40,000** payoff — state-of-mind/chronology; limited privilege waiver.
- **Ex. N-4 — Third Status Report** (Dec. 17, 2012) — incorporates early narrative; default judgments; routine collection.
- **Ex. N-5 — Fourth Status Report** (Mar. 29, 2013) — writs issued; service planned (routine collection).
- **Ex. N-6 — Fifth Status Report** (Apr. 29, 2013) — writs served; returned unsatisfied; supplementary proceedings (routine collection).
- **Ex. N-7 — Eleventh Status Report** (Nov. 2014) — venue transfer/mix-up; continued collection efforts.
- **Ex. N-8 — Fourteenth Status Report** (July 13, 2015) — registration/enforcement in Massachusetts state court.
- **Ex. N-9 — Final Report** (filed for chronology only; **not** offered for cash-collateral issues).
- **Ex. N-10 — Trustee Form 2 (excerpt)** — entry identifying **Godbout Law PLLC** as purchaser/assignee of the 2012 default judgment (provided solely to clarify the **assignment chain**; not offered for any cash-collateral issue).

**EXHIBIT INDEX — RELATED PROCEEDINGS (SUPPLEMENTAL)**

18

- **Ex. O — Renewed Motion to Vacate Void Judgment** under **Rule 60(b)(4)** (R.I. Super. Ct.) — procedural voidness; non-finality for preclusion.

*Reserved (not filed here): Any additional insider/chain-of-title materials (e.g., Apponaug/Grieco correspondence, deposition excerpts, commitment letters, or deeds) are unnecessary to adjudicate the claims against Mr. DiOrio and are reserved to avoid joinder issues. Plaintiffs reserve all rights to use or file such materials in other proceedings or if later warranted.*

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment in their favor and against Defendant and the following relief:

A. **Declaration of Ultra Vires (Count I).** Declare that Defendant's pre-appointment shutdown actions in July 2010—taken before bond/acceptance and without a written shutdown order—were ultra vires and outside any quasi-judicial immunity.

B. **Compensatory Damages.** Award compensatory damages proximately caused by Defendant's ultra vires conduct, including (subject to proof) loss of going-concern value and foreseeable downstream harms, without double recovery.

C. **Declaratory/Corrective Relief (Executions, Count II).** Declare that trustee-titled executions issued March 2025 were ultra vires and void; direct Defendant to disclaim/withdraw reliance and correct the public record.

D. **Narrow Injunction (Defendant only).** Enjoin Defendant from representing himself as trustee or purporting to act/file in Plaintiffs' name regarding the sold judgment.

E. **Punitive Damages; Costs; Further Relief.** As allowed by law.

JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,
/s/ James Cronan
James Cronan
91 Oak Street
Norton, Ma, 02766
jamescronan123@gmail.com
508-353-9139

/s/ Karen Merritt
Karen Merritt
91 Oak Street
Norton, Ma, 02766
508-239-4924

20